### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

**LUKE 21:4-B MINISTRY &**
**HOME RENTALS, LLC**                                                    **PLAINTIFF**

**v.**                                    **Case No. 3:24-cv-00034-KGB**

**CITY OF OSCEOLA AND**
**MAYOR JOE HARRIS, JR.**
**INDIVIDUALLY AND IN HIS**
**OFFICIAL CAPACITY**                                                    **DEFENDANTS**

### OPINION AND ORDER

Before the Court is the motion for summary judgment of defendants City of Osceola ("the City") and Mayor Joe Harris, Jr. individually and in his official capacity (Dkt. No. 18). Plaintiff Luke 21:4-B Ministry & Home Rentals, LLC's ("Luke") has responded to the motion for summary judgment (Dkt. No. 25), and defendants have replied in support of their motion (Dkt. No. 28). Luke filed suit against the City and Mayor Harris alleging infringement on procedural due process rights under the Fifth and Fourteenth Amendments of the United States Constitution and inverse condemnation (Dkt. No. 2). Defendants removed this action to this Court (Dkt. No. 1). For the following reasons, the Court grants defendants' motion for summary judgment on all of Luke's claims (Dkt. No. 18).

### I.    Factual Background

The following facts are taken from the parties' filings unless otherwise noted as set forth in this Court's Order (*see* Dkt. Nos. 20, 25).

### A.    The City's Applicable Ordinances And Codes

In 1978, Ordinance Number 1978–514 designated the City of Osceola Planning Commission as the Board of Appeals, granting it the duties and functions authorized by Act 629 of the General Assembly of Arkansas, 1969 (Dkt. No. 20, ¶ 1).

In 2005, the City passed Ordinance Number 2005–806, which adopted the 2002 National Electrical Code (*Id.*, ¶ 2).

In 2006, the City passed Ordinance Number 2006-834, which adopted the 2003 edition of the International Property Maintenance Code (*Id.*, ¶ 3).  The International Property Maintenance Code provides standards for regulating and governing the conditions and maintenance of all property, buildings, and structures.  These standards ensure that structures are safe, sanitary, and fit for occupation and use (*Id.*).

In 2008, the City passed Ordinance Number 2008-860, which adopted the 2006 Arkansas State Plumbing Code (*Id.*, ¶ 4).  In 2008, the City passed Ordinance Number 2008-861, which adopted the 2007 Arkansas Fire Prevention Codes, Vol. I, II, and II (*Id.*, ¶ 5).

On October 17, 2016, the City passed Ordinance Number 2016-14, which adopted the City of Osceola Zoning Code (*Id.*, ¶ 6).  The City's zoning districts are outlined in the Osceola Zoning Code (*Id.*, ¶ 7).  The Osceola Building Inspector must administer and enforce the regulations and process all applications for permits and variances (*Id.*, ¶ 8).

Ordinance Number 1980-535 established the Board of Adjustment, which is responsible for the enforcement of Osceola's zoning regulations (*Id.*, ¶ 9).  The Zoning Code further provides that the Board of Adjustment consists of members of the Planning Commission (*Id.*, ¶ 10).  It hears appeals from the decisions of the Building Inspector, requests for variances, and permit changes to nonconforming uses and structures (*Id.*).  A decision of the Board of Adjustment may be

2

appealed within 30 days of the decision to a court of record in Mississippi County, Arkansas (*Id.*, ¶ 11).

### B.   Ownership Of 100, 102, and 104 O T Williams Drive

Luke was organized on March 19, 2018, with Lenora Robinson listed as the sole officer (*Id.*, ¶ 12).  The properties at issue in this lawsuit are located at 100, 102, and 104 O T Williams Drive in Osceola, Arkansas (*Id.*, ¶ 13).[1]  The 100 and 102 O T Williams Drive properties are owned by Ms. Robinson's grandson, Ky'Len Anderson (*Id.*, ¶ 14).  The quitclaim deed transferring ownership of the properties located at 100 and 102 O T Williams Drive to Mr. Anderson was signed on July 30, 2020; however, it was not recorded until October 5, 2020 (*Id.*, ¶ 15).  The 104 O T Williams Drive property is owned by Luke, of which Ms. Robinson is the sole officer (*Id.*, ¶ 16).  The 104 O T Williams property was purchased on April 16, 2018 (*Id.*).

### C.   Development Of 100, 102, and 104 O T Williams Drive

Ms. Robinson intended to put structures on the O T Williams lots and use them as rental units (*Id.*, ¶ 17).  Before Mr. Anderson owned the 100 and 102 O T Williams lots, Ms. Robinson testified that, in January and February 2020, she began the preparation stages of cleaning up the debris on the lots on O T Williams, which at the time, were all empty lots (*Id.*, ¶ 18).

In February 2020, Ms. Robinson's contractor, James Wilkerson, met with the City's Code Enforcement Officer, Ed Richardson, to discuss the plans for developing the lots, including taking measurements to ensure that the lot sizes were large enough to be occupied with property according to the Zoning Code (*Id.*, ¶ 19).  Ms. Robinson testified that Officer Richardson was provided with a hand drawn layout of the structure sizes and specifications; however, she did not provide any

---

[1]   During Ms. Robinson's deposition, the parties confirmed that there is no 101 O T Williams Drive.  The complaint should have referenced 100 O T Williams Drive (Dkt. Nos. 20, n.1; 20-4, at 5).

photographs to Officer Richardson of the structures that she planned to place onto the property (*Id.*, ¶ 20). Ms. Robinson testified that all conversations about what was being done on the properties were between Mr. Wilkerson and Officer Richardson and that she was not privy to those conversations (*Id.*, ¶ 21). Ms. Robinson did not have any contact with Officer Richardson at that time (*Id.*).

In May 2020, Ms. Robinson purchased two Derksen Portable Buildings from Walnut Ridge, Arkansas, to be placed on 100 and 102 O T Williams (*Id.*, ¶ 22). Ms. Robinson testified that she is the one who purchased and owned these structures, not Luke (*Id.*).

On June 30, 2020, Ms. Robinson applied for a residential building permit to Officer Richardson for all three of the O T Williams properties (*Id.*, ¶ 23). The permit application specified the construction of new homes on the lots, with dimensions of 20 feet by 30 feet and a total area of 600 square feet, and listed Mr. Wilkerson as the contractor (*Id.*, ¶ 24). The permit application specifically states that "separate permits are required for plumbing, electrical, and mechanical," and that the permit is good for six months (*Id.*, ¶ 25). Ms. Robinson signed the Residential Building Permit form, acknowledging that she must adhere to local, state, and federal regulations and codes as required by City Ordinance Number 1992-661 for the construction project specified in the application (*Id.*, ¶ 26). A permit was issued the same day (*Id.*).

On July 6, 2020, and July 7, 2020, the Derksen Portable Buildings were delivered and placed on 100 and 102 O T Williams Drive (*Id.*, ¶ 27). The structures were already assembled when delivered to the O T Williams properties and did not bear a certification placard from the federal government stating that the structure had been inspected or that they met federal regulations for manufactured homes (*Id.*, ¶ 28).

4

A third red Derksen Portable Building was relocated from its original site at 315 Hale Street to 104 O T Williams Drive (*Id.*, ¶ 29). Ms. Robinson testified that she owned this structure (*Id.*). According to Ms. Robinson, Officer Richardson was present when the structures were delivered, and this was the first time that he was seeing the structures that Ms. Robinson was placing on the lots (*Id.*, ¶ 30).

In August and September 2020, Ms. Robinson stated that interior work and landscaping occurred at the properties, including "framing work" because the structures lacked walls, including a lack of separate spaces for bathing, sleeping, and eating, as well as a lack of plumbing, or electrical systems (*Id.*, ¶ 31).

On October 1, 2020, Ms. Robinson's electrician, Danny Crockett, met with Officer Richardson, and the City's Electrical Department Manager, Phillip Adcock, at the O T Williams properties (*Id.*, ¶ 32). Mr. Adcock informed both Ms. Robinson and Mr. Crockett that the structures could not be connected to the City's electrical services because he believed that there might be setback issues and because accessory buildings were not allowed in that zone since there was not a primary residence on the lots (*Id.*).

On October 2, 2020, Officer Richardson delivered a letter to Ms. Robinson's home that stated that she must stop work on the three O T Williams properties immediately due to noncompliance with Arkansas Manufactured Home Commission regulations (*Id.*, ¶ 33). On October 27, 2020, Ms. Robinson's first attorney, Furonda Brasfield, emailed Osceola's City Attorney, Catherine Dean, regarding the O T Williams properties and the "zoning issue," to which Ms. Dean responded that she would need to meet with Code Enforcement to find out what was going on (*Id.*, ¶ 34).

In January 2021, a new City Attorney, David Burnett, took office, and Ms. Brasfield emailed Mr. Burnett inquiring about the properties (*Id*., ¶ 35).  In May 2021, Ms. Brasfield had a conversation with Mr. Burnett, who indicated that the structures did not meet State building requirements, that they possibly did not conform to electrical or plumbing code, and that they therefore could not be connected to electric or water (*Id*., ¶ 36).  Mr. Burnett further stated that the structures were not intended for habitation and not built to the code for modular homes (*Id*.).

On December 7, 2021, Ms. Brasfield reached out to the new Code Enforcement Officer, Cody Shreve, asking for a letter specifying what codes had been violated (*Id*., ¶ 37).

On December 8, 2021, the City's new Code Enforcement Officer, Cody Shreve, sent a letter to Ms. Robinson and her attorney, Ms. Brasfield, detailing the issues with the structures and attaching a copy of the zoning code for review (*Id*., ¶ 38).  The letter listed the specific noncompliance issues outlined below:

- The building permit was approved for a structure of 20 x 30 with a heated sq. ft. of 600.  Attached to the application for the permit is the parcel information and a note that James Wilkerson of Malden, MO, was to be the contractor.  The code enforcement at the time noted that new buildings were to be put up on the lots by the contractor.  It was the city's understanding that new structures would be built and not brought in.

- The structures that were placed on the property are not in compliance to have meters attached.  Sheds/Accessory Buildings are not eligible to have electricity connected without a primary residence structure sharing that parcel of land.  Under the building codes, sheds/movable cabin structures cannot be turned into living units.

- The structures placed on the property did not comply with HUD Manufactured Homes and AR Manufactured Home Codes.  This area is also not zoned to allow manufactured homes to be placed in this area.  Currently this area is zoned as R–3 Residential Apartments.

(*Id*.).

6

Between January and March 2022, numerous emails were exchanged between Ms. Brasfield and the City, during which the City consistently outlined the issues concerning the structures on the properties (*Id.*, ¶ 39).

On January 7, 2022, the City again told Ms. Brasfield that the structures were a safety issue and did not comply with the electrical code (*Id.*, ¶ 40). Mr. Burnett told Ms. Brasfield that an appeal could be taken to the appropriate committee and City Council (*Id.*).

At some point, Ms. Robinson hired a second attorney, Lion Legal, which sent a demand letter to the City on March 7, 2022 (*Id.*, ¶ 41). On March 22, 2022, the City responded to the demand letter and informed Lion Legal that the reason the City could not provide electric service to the structures was that the structures could not be used for housing because they failed to meet state or city regulations (*Id.*, ¶ 42).

On July 7, 2022, Lion Legal provided Ms. Robinson with a very detailed letter outlining all the communications from the City which set forth the specific issues with the O T Williams properties (*Id.*, ¶ 43). The letter stated that the structures are classified as "accessory buildings/sheds" under the zoning code, which are not permitted in an R3 zone, and that Ms. Robinson would have to apply for a variance (*Id.*). The letter concluded that it would be nearly impossible for Ms. Robinson to use the accessory buildings on the lots as standalone livable structures because they do not meet code; the letter advised Ms. Robinson that it would be more beneficial for her to sell the structures and build small houses that meet building requirements and the zoning of the land (*Id.*).

Ms. Robinson then hired a third attorney, Jay Paul Coleman, who on September 26, 2023, sent a letter to the City inquiring about the issues with the properties and asking to be placed on the City Council agenda (*Id.*, ¶ 44).

On October 16, 2023, Mr. Coleman attended and spoke at the Osceola City Council meeting regarding the O T Williams properties (*Id*., ¶ 45).  During the City Council meeting, Ms. Robinson and her current attorney were informed of the following:

- The proper procedure would be to ask for a variance from the Planning Commission, and then if it is unfavorable, Ms. Robinson can appeal to the City Council;

- The buildings are sheds, are not meant for human habitation, and do not meet the current zoning or building codes and thus, cannot be hooked up to electricity; and

- This is not the proper venue to address this issue.

(*Id*., ¶ 46).

Mr. Coleman admitted during the City Council meeting that the City Attorney had already provided a letter answering why the structures could not be placed on the property, that he and Ms. Robinson did not agree with that answer, and that he and Ms. Robinson were at the Council to appeal essentially that decision (*Id*., ¶ 47).  Mr. Coleman was instructed, again, that he would need to go before the Planning Commission in order to do that (*Id*., ¶ 48).

On October 24, 2023, Mr. Coleman sent a letter to the City asking for a meeting with the Mayor and Mr. Burnett to discuss the O T Williams properties (*Id*., ¶ 49).  Mr. Burnett responded to the letter reiterating that the structures do not meet building codes and cannot be connected to city services until they are brought into compliance and recommended that Ms. Robinson contact a licensed electrician and plumber to address the issues (*Id*., ¶ 50).  Mr. Burnett emphasized that the structures are currently uninhabitable in their present state and recommended going before the Planning Commission (*Id*.).

Ms. Robinson's last communication with the City regarding the properties was on October 29, 2023 (*Id*., ¶ 51).  Ms. Robinson testified that neither she nor her attorney went before the Planning Commission (*Id*., ¶ 52).  Ms. Robinson testified that neither she nor her attorney applied

for a variance (*Id.*, ¶ 53). Ms. Robinson testified that neither she nor her electrician, Danny Crockett, had ever applied for an electrical permit (*Id.*, ¶ 54).

The residential building permit from June 30, 2020, has expired because such permits expire if construction or work is suspended or abandoned for a period of six (6) months at any time after work is commenced (*Id.*, ¶ 55).

Mayor Joe Harris, Jr. did not become the Mayor for the City of Osceola until January 1, 2023 (*Id.*, ¶ 56). Mayor Harris's only involvement with the O T Williams property was presiding over the City Council meeting on October 16, 2023 (*Id.*).

### D.    Structures On O T Williams Lots And The Zoning Code

The O T Williams lots are zoned as R–3 Apartment Residential (*Id.*, ¶ 57). The R–3 residential zoning district permits accessory buildings and uses, single-family dwellings, two-family dwellings, three/four-family dwellings, apartment dwellings, and townhouses. R-3 zones do not permit accessory dwelling units, mobile homes, or manufactured homes (*Id.*, ¶ 58).

The City's Zoning Code defines "Dwelling" as "any building or portion thereof, which is designed or used as living quarters for one or more families, but not including house trailers, mobile homes, or travel trailers." (*Id.*, ¶ 59). The "'living quarters' must contain spaces for bathing, sleeping and meal preparation and eating." (*Id.*).

The City's Zoning Code defines "Accessory Buildings and Uses" as:

> a subordinate building or a portion of the main building, the use of which is clearly incidental to or customarily found in connection with, and (except as otherwise provided in these regulation[s]) located on the same lot as the use of the main building or principal use of the land. An accessory use that is clearly incidental to or customarily found in connection with and on the same lot as the primary use of the premises. When "accessory" is used in the text, it shall have the same meaning as accessory use.

(*Id.*, ¶ 60).

The City's Zoning Code defines an "Accessory Dwelling Unit" as:

a smaller, secondary site-built dwelling unit on the same lot as an existing single-family dwelling.  The unit includes its own independent living facilities with provisions for sleeping, cooking, and sanitation, designed for residential occupancy independent of the primary dwelling unit.

(*Id.*, ¶ 61).

The City's Zoning Code defines a "variance" as an exception from the strict application of the provisions of these regulations (*Id.*, ¶ 62).

Pursuant to the Osceola Zoning Code, the O T Williams structures owned by Ms. Robinson are classified as accessory buildings, which are not intended for living purposes (*Id.*, ¶ 63).  Luke contends that "there has been nothing brought forth that classifies Luke's building as accessory buildings." (Dkt. No. 25-1, at 1).  The Court disagrees with Luke's challenge to Defendants' statement of fact, and Luke cites no record evidence in support of its denial.  Instead, Defendants' statement is supported by the definition of accessory building that is "incidental to or customarily found in connection with, and . . . located on the same lot as the use of the main building or principal use of the land." (Dkt. No. 20, ¶ 60).  Defendants' statement is also supported by the testimony of Officer Richardson, who has been given the authority as the City's appointed administrative official to enforce the zoning code (Dkt. No. 20-2, at 8).  Officer Richardson testified at his deposition that he was defining the structures on O T Williams as accessories or utilities buildings because "they were empty shell buildings that didn't have anything in them." (Dkt. No. 20-7, at 8).  Officer Richardson defined an accessory building as a "utility building for housing storage for different items" (*Id.*).  Finally, Defendants' statement is supported by the testimony of Mr. Adcock who also testified that the structures were "accessory buildings" that were "not allowed in that area" under the City's zoning code (Dkt. No. 20-12, at 5).  Mr. Adcock stated his understanding of an "accessory building" under the City's zoning code was "like a

10

portable shed or a building that's outside the primary structure." (*Id*., at 5–6).  Based on the record evidence before the Court, the Court determines that this fact is undisputed; Luke has not come forward with record evidence to establish a genuine dispute of material fact about the structures on O T Williams being classified as accessory buildings under the City's zoning code.

R–3 zoning districts allow accessory buildings, provided a principal residence exists on the property, which the O T Williams properties did not have (*Id*., ¶ 64).  R–3 zoning districts do not allow accessory dwelling units, regardless of whether a primary residence exists on the property (*Id*., ¶ 65).

## II.      Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Incorporated v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923–24 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone

to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

**III.    Analysis**

**A.    Standing**

Defendants contend that Luke does not currently own, nor has it ever owned, the properties at 100 and 102 O T Williams Drive (Dkt. No. 20, ¶ 14). Defendants have come forward with the deeds to support this contention, and Luke offers no facts to contradict the evidence presented by Defendants (Dkt. No. 25-1). Instead, Luke states that the structures[2] on the properties were purchased by Ms. Robinson for the benefit of Luke (Dkt. No. 27, at 1). This representation is not supported by any evidence in the record as required by Federal Rule of Civil Procedure 56.

Luke asserts standing as to its inverse condemnation claim on 100 and 102 O T Williams Drive based on what it refers to as a "pecuniary interest in the outcome of the action" (*Id*.).

---

[2]    Luke refers to the structures as "cabins" which is different from the term used in Defendants' statement of undisputed material facts. For continuity, the Court will continue to refer to what Ms. Robinson has placed on the O T Williams properties at issue in this case as "structures."

Under Arkansas law, "inverse condemnation is a cause of action against a governmental defendant to recover the value of property that has been taken in fact by a governmental entity, although not through eminent-domain procedures." *City of Rogers v. Powell, Trustee of Abigail Ruth Powell Revocable Trust U/D November 15, 2001*, 698 S.W.3d 390, 393 (Ark. Ct. App. 2024) (citing *Robinson v. City of Ashdown*, 783 S.W.2d 53 (Ark. 1990)). "When a municipality acts in a manner that substantially diminishes the value of a *landowner's* land, and its actions are shown to be intentional, it cannot escape its constitutional obligation to compensate for a taking of property on the basis of its immunity from tort action." *Id.* (emphasis added).

A property owner's right to bring an inverse-condemnation action is set forth in Arkansas Code Annotated § 18–15–410(a) (Repl. 2015), which provides:

> If a municipality shall enter upon property which it has the right to acquire by condemnation proceedings without commencing condemnation proceedings, the owner of the property shall have the right to commence condemnation proceedings against the municipality at any time before an action for the recovery of the property or compensation therefor[e] would be barred by the statute of limitations.

As the statute makes clear, only the owner of the property has the right to commence condemnation proceedings against the municipality for compensation. Ark. Code Ann. § 18-15-410(a). Because Luke is not the owner of 100 and 102 O T Williams Drive, it does not have standing to commence an inverse condemnation proceeding against the City related to those two properties. Even if Luke had standing with respect to these properties, Luke's claims would fail on the merits for the same reasons explained in this Opinion and Order as to 104 O T Williams Drive.

Defendants do not challenge Luke's standing with respect to 104 O T Williams Drive. Accordingly, Luke may proceed with its inverse condemnation claim only as to 104 O T Williams Drive. For the following reasons, this Court determines that Luke's inverse condemnation claim fails.

13

### B.      Luke's Failure To Exhaust Administrative Remedies

Defendants contend that this Court lacks subject matter jurisdiction over Luke's inverse condemnation claim because Luke failed to exhaust its remedies by bringing its case in the Mississippi County, Arkansas, Circuit Court within 30 days from the date of the municipal body's final decision as required by Arkansas Inferior Court Rule 9 (Dkt. No. 19, at 6–7).   Defendants argue that City Code Enforcement Officer Richardson notified Ms. Robinson by letter on October 2, 2020, that she must stop work on the properties immediately due to noncompliance with Arkansas Manufactured Home Commission regulations (Dkt. No. 20, ¶ 33).  Further, in May 2021, seven months later, Ms. Robinson's first attorney, Ms. Brasfield had a conversation with new Osceola City Attorney, David Burnett, who indicated that he had consulted with City officials and confirmed that the structures on the properties did not meet State building requirements, did not conform to electrical and plumbing code, and therefore could not be connected to the City's electric or water (*Id.*, ¶ 36).  Undisputed record evidence demonstrates that Luke did not challenge the City attorney's statements, did not apply for a variance, and did not go before the City Planning Commission.

On December 8, 2021, the City's new Code Enforcement Officer, Mr. Shreve, sent a letter to Ms. Robinson and Ms. Brasfield detailing the issues with the structures (*Id.*, ¶ 38).  After Mr. Shreve sent his letter, numerous emails were exchanged from January to March 2022 between Ms. Brasfield and the City during which the City consistently outlined the issues concerning the structures on the properties (*Id.*, ¶¶ 39-42).  On March 22, 2022, the City responded to a demand letter from Ms. Robinson's new attorney at Lion Legal again informing her that the reason the City could not provide electric services to the structures was because the structures failed to meet state or City regulations (Dkt. No. 20, ¶¶ 38; 42).  In turn, Lion Legal sent a letter to Ms. Robinson

advising her that the City had "clearly outlin[ed] the reasons for the refusal to allow the project to go forward" because the current structures are accessory buildings that do not meet the City's zoning requirements; counsel recommended that Ms. Robinson use the existing foundations and footings to build new homes from the ground up that would meet the zoning requirements for the area and she would not have to apply for a variance (Dkt. No. 20-21, at 2-3).

On October 16, 2023, Ms. Robinson and a third attorney appeared at a City Council meeting and again asked about electricity to the structures.  They were instructed that the proper process to address the issue would be to go before the Planning Commission and request a variance (*Id*., ¶ 46).  The final communication sent from the City to Luke regarding the O T Williams properties was sent by Mr. Burnett on October 29, 2023 (*Id*., 51).  During these email exchanges with Luke's counsel, Mr. Burnett recommended that Luke go before the Planning Commission to discuss its issues with respect to the property (*Id*., ¶¶ 49–51).

It is undisputed that neither Ms. Robinson on behalf of Luke nor her attorneys on behalf of Luke ever appeared before the Planning Commission.  Further, it is undisputed that neither Luke, Ms. Robinson, nor the attorneys on behalf of Luke or Ms. Robinson, ever requested a variance from the City.

Under Arkansas Inferior Court Rule 9, appeals from the final administrative or quasi-judicial decision by the municipal body administering this subchapter shall be taken to the circuit court of the appropriate county using the same procedure as for administrative appeals of the District Court Rules of the Supreme Court.  *See* Ark. R. Dist. Ct. 9 (providing "thirty (30) days from the date of [the final administrative] decision" to file an appeal with the clerk of the circuit court having jurisdiction of the matter); *see also* Ark. Code Ann. § 14-56-425.  Moreover, the filing requirements of Rule 9 are mandatory and jurisdictional, and failure to comply prevents the

15

circuit court from acquiring subject-matter jurisdiction. *See Ingram v. City of Pine Bluff*, 133 S.W.3d 382, 385 (Ark. 2003) (determining that property owner who waited over two years to appeal the City's decision, was well outside the 30-day requirement of Rule 9 and the Circuit Court lacked jurisdiction to hear the property owner's claim) (citing *Douglas v. City of Cabot,* 59 S.W.3d 430 (Ark. 2001) (other citations omitted)).  Luke filed its petition in the Mississippi County, Arkansas, Circuit Court on March 7, 2024, more than 30 days after the last correspondence from the City and over three years after the City's Code Enforcement Officer sent its October 2020 stop work notice to Ms. Robinson.  Luke's complaint challenging the decision of the City not to permit Luke to develop the structure on 104 O T Williams Drive into an accessory dwelling is untimely, and the Court does not have jurisdiction over the claim.  *See Ingram v. City of Pine Bluff*, 133 S.W.3d at 385.

Luke argues that neither the City nor Mayor Harris ever made a decision for Luke to appeal (Dkt. No. 27, at 2).  Based on the undisputed facts in the record before the Court, the City, through Officer Richardson its City Code Enforcement Officer, notified Ms. Robinson by letter on October 2, 2020, that she must stop work on the properties immediately due to noncompliance with Arkansas Manufactured Home Commission regulations (Dkt. No. 20, ¶ 33).  As set forth above, following this stop work notice, the City, through its employees, notified Ms. Robinson and her counsel many times that she could go before the Planning Commission to request a variance to continue with her project.  *See Ingram*, 133 S.W.3d at 386 (rejecting property owner's claim of lack of notice when he received notice of a meeting at which the issue was discussed and meeting was also televised).

Here, Ms. Robinson does not dispute that she received the stop work notice from Officer Richardson.  She did not file an appeal from the decision to the Planning Commission or file a

claim with the Mississippi County, Arkansas, Circuit Court until over three years later when she initiated this action in state court (Dkt. No. 2). Accordingly, this Court lacks jurisdiction. Because the Court lacks jurisdiction over Luke's inverse condemnation claim, the Court will not discuss the other arguments raised by Defendants related to the inverse condemnation claim, and the Court grants Defendants' motion for summary judgment on Luke's inverse condemnation claim.

### C.    Procedural Due Process Under The Fifth And Fourteenth Amendments Of The Arkansas Constitution

Luke asserts violations of its procedural due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, § 2[3] of the Arkansas Constitution (Dkt. No. 2, ¶¶ 27–35). Luke asserts that it was denied due process because it was not afforded an opportunity to explain what it was trying to do with the structures placed on the O T Williams properties and because it was not allowed to explain why a variance was not needed (Dkt. No. 2, ¶¶ 31–33). Luke also contends that Defendants violated its due process rights because Defendants failed to provide adequate notice, a meaningful hearing before the appropriate committee, or an opportunity to rectify the violations to comply with the regulations (*Id.*, ¶¶ 34–35).

Defendants complain that Luke fails to plead any factual allegations that distinguish its due process claim from its takings claim (Dkt. No. 19 (citing *Pietsch v. Ward County*, 991 F.3d 907, 909-910 (8th Cir. 2021) (holding that when plaintiffs have a remedy for unconstitutional exactions under the takings clause, they cannot claim a redundant remedy under the due process clause); *see also Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 855 (9th Cir. 2007) ("[T]he Fifth Amendment would preclude a due process challenge only if the alleged conduct is actually covered

---

[3]    The Court will assess Luke's procedural due process claim under Article 2, § 21, of the Arkansas Constitution, which contains Arkansas's procedural due process clause. *See City of Little Rock v. Alexander Apartments, LLC*, 592 S.W.3d 224, 231 (Ark. 2020).

17

by the Takings Clause.")).  Defendants argue that, because Luke already had a remedy under the takings clause, it cannot also claim a remedy under the due process clause.

Even if this Court were to consider Luke's due process clause claim on the merits, the Court would conclude that Luke has no remedy under the due process clause for the following reasons.  The Eighth Circuit has stated that "procedural due process claims require a two-step analysis.  Initially, a plaintiff must demonstrate that the state deprived him of some 'life, liberty, or property' interest.  If successful, the plaintiff must then establish that the state deprived him of that interest without sufficient 'process.'"  *Krentz v. Robertson*, 228 F.3d 897, 902 (8th Cir. 2000).

Defendants argue that Luke's procedural due process claim fails for three reasons.  Defendants assert the claim is barred by the statute of limitations, that there was no deprivation of a constitutionally protected property interest, and that, even if Luke had a protected interest, the due process claim fails because the City's procedures offered adequate notice and an opportunity for Luke to be heard (Dkt. No. 19, at 18–22).  For the following reasons, the Court agrees.

### 1.      Statute Of Limitations

Claims brought under 42 U.S.C. § 1983 are governed by the personal injury statute of limitations of the state where the claims arose.  *See Wilson v. Garcia*, 471 U.S. 261, 269 (1985); *Wycoff v. Menke*, 773 F.2d 983, 984 (8th Cir. 1985).  Under Arkansas law, personal injury actions have a three-year statute of limitations.  *See* Ark. Code Ann. § 16-56-105(3).  The Eighth Circuit has held that this three-year statute of limitations applies to § 1983 claims in Arkansas.  *See Miller v. Norris*, 247 F.3d 736, 739 (8th Cir. 2001) ("We note that Arkansas's three-year personal injury statute of limitations . . . applies to this § 1983 action filed in Arkansas.); *Ketchum v. City of West Memphis*, 974 F.2d 81, 82 (8th Cir. 1992) ("In Arkansas, the general personal-injury statute of limitations is three years, and this period therefore governs § 1983 actions brought in that state.");

*Morton v. City of Little Rock*, 934 F.2d 180, 183 (8th Cir. 1991) ("[I]n Arkansas the applicable period for a § 1983 action is three years." (citing Ark. Code Ann. § 16-56-105; *Lyons v. Goodson*, 787 F.2d 411, 412 (8th Cir. 1986))).

Here, the City's Building Inspector must administer and enforce the regulations in the City's code. The facts are undisputed. The City's building inspector, Officer Richardson, notified Ms. Robinson by letter on October 2, 2020, that she must stop work on the properties immediately due to noncompliance with Arkansas Manufactured Home Commission regulations (Dkt. Nos. 20, ¶ 33; 20-13). Luke did not appeal that decision. The City's zoning code established a Board of Adjustment, which consisted of members of the Planning Commission, that could hear appeals from decisions of the Building Inspector, requests for variances, and permit changes to nonconforming uses and structures (Dkt. No. 20, ¶ 10). Under relevant code provisions, Planning Commission's decisions could be appealed within 30 days to a court of record in Mississippi County, Arkansas (*Id.*, ¶ 11). Ms. Robinson never appealed the stop work order to the City's Planning Commission. Luke did not file its lawsuit in the Mississippi County, Arkansas, Circuit Court until February 2, 2024 (Dkt. No. 2), more than three years after the City's inspector issued its stop work letter. Accordingly, Luke's procedural due process claim as it relates to the building permit is barred by the statute of limitations.

Luke responds that it was denied procedural due process at the City Council meeting on October 16, 2023, when it was not permitted to "go before the City of Osceola to request an understanding about why it could not develop its cabins." (Dkt. No. 27, at 8). It is undisputed, however, that under the process set forth in the City's zoning code, Luke was required to go before the City's Planning Commission to address the zoning issue prior to going before the City Council. (Dkt. No. 20-2, at 5). It is undisputed that Luke did not ever go before the City's Planning

Commission to discuss plans for the O T Williams properties or the request for a new building permit for the property at 104 O T Williams after the original one had expired (Dkt. No. 20, ¶ 55; 20-10, at 2). Accordingly, Luke did not properly follow any process necessary to consider its appeal to the City Council in October 2023 timely, and Luke's due process claim is barred by the statute of limitations.

### 2.      Procedural Due Process

Even if Luke filed a timely procedural due process claim that this Court could properly consider, the due process claim fails because Luke did not have a protected property interest, and, even if it did, Luke was provided notice and an opportunity to be heard. Luke does not have a protected property interest under Arkansas law in the building permit that it obtained from the City on June 30, 2020. Under Arkansas law, "[t]he general rule is that a grant of a license by a municipality is made with the implied reservation of the right to impose reasonable police regulations, which may go to the extent of revoking the license . . . Therefore, the possession of a license does not exempt the licensee from the operation of ordinances and regulations that were legally enacted . . ." *Smith v. City of Arkadelphia*, 984 S.W.2d 392, 394 (Ark. 1999).

As set forth above, Arkansas Code Annotated § 14-56-201, gives the City the power to regulate construction of buildings and Arkansas Code Annotated § 14-55-102 gives municipal corporations the power to establish ordinances consistent with state law to preserve the safety and health of its inhabitants. *Id*. Here, Ms. Robinson applied for a residential building permit to Officer Richardson for the O T Williams properties stating that she intended to construct *new* homes on the properties (Dkt. No. 20, ¶ 24). On October 2, 2020, after the City's Electrical Department Manager viewed the structures that Ms. Robinson had moved onto the properties, which he considered to be accessory buildings under the City's code, Officer Richardson delivered

a letter to Ms. Robinson ordering her to stop work on the properties due to noncompliance with Arkansas Manufactured Home Commission regulations (*Id.*, ¶¶ 32–33).

A property right may develop when good faith acts of reliance are taken on the premises. *Id.* (citing *Tankersley Bros. Indus., Inc. v. City of Fayetteville,* 296 S.W.2d 412, 415 (Ark. 1956)). In *Tankersley*, the Arkansas Supreme Court acknowledged that, when a property owner has incurred liability based on a permit, the property owner acquires a "kind of property right," and "it is generally held that the permit cannot be revoked without cause or in the absence of any public necessity for such action." *Tankersley Bros. Indus., Inc.*, 296 S.W.2d at 415. However, here Luke does not point to any liability that it incurred *after* it obtained the permit to assert a property right based on the permit it obtained from the City.

Instead, citing *City of Little Rock v. Alexander Apartments, LLC*, 592 S.W.3d 224, 230 (Ark. 2020) ("*Alexander Apartments*"), Luke argues that, as an owner of property on O T Williams, Luke has an "interest in the property" and a "right to go before the City of Oscola to request an understanding about why it could not develop its cabins," presumably into rental properties (Dkt. No. 27, at 8). In *Alexander Apartments*, the Court determined that the City of Little Rock deprived Alexander Apartments of a property interest when the City of Little Rock's Fire Chief ordered Alexander Apartments to cease its leasing operations and ordered its tenants to vacate the premises without providing any process for Alexander Apartments or its tenants to challenge the Fire Chief's actions. *Id.*

This case is distinguishable from *Alexander Apartments*. Here, unlike in *Alexander Apartments*, there were due process provisions in place in the City's zoning code. The City passed Ordinance Number 1980-535 establishing the Board of Adjustment, which is responsible for the enforcement of Osceola's zoning regulations (Dkt. No. 20, ¶ 9). The City also passed Ordinance

No. 2016-14 on October 17, 2016, which adopted the Zoning Code (*Id.*, ¶ 6).  The Zoning Code provides that the Board of Adjustment consists of members of the Planning Commission.  The Board of Adjustment hears appeals from the decisions of the Building Inspector, requests for variances, and permit changes to nonconforming uses and structures (*Id.*, ¶ 10).  A decision of the Planning Commission may be appealed to the City Council (Dkt. No. 20-2, at 5).  The Zoning Code provides that a decision of the Board of Adjustment may be appealed within 30 days of the decision to a court of record in Mississippi County, Arkansas (Dkt. No. 20, ¶ 11).

When Luke purchased the property at issue, it was zoned R-3 residential, which prohibited accessory dwelling units under the City's code.  In other words, the properties at issue were not zoned for the type of structure that Luke envisioned placing on the properties.  Here, unlike in *Alexander Apartments*, there was a process in place by which Luke could go before the City's Planning Commission to request a variance after receiving the City's stop work order, and then, if Luke did not agree with the decision of the Planning Commission, it could appeal the Planning Commission's decision to the City Council or file a complaint in Mississippi County, Arkansas, Circuit Court.  Here, Luke admits that there is such a process, but Luke states that it did not want to go to the Planning Commission and seek a variance.  Instead, Luke wanted to go straight to the City Council.  Luke called the City's process requiring that Luke seek a variance "an attempt to run Luke around and avoid the issue." (Dkt. No. 27, at 9).  Luke cannot claim a lack of due process based on its refusal to pursue the steps in the process that were available under the City's zoning code.  It is undisputed that Luke never requested a second building permit and that Luke never went before the Planning Commission to request a variance.  Luke's refusal to follow these available processes, which could have led to an appeal before the City Council, do not lead the Court to conclude that there was a lack of due process.

Further, here Luke acknowledges that it was "given the opportunity to go before the City [Council] in efforts to explain why Luke believed that it had a right to develop the cabins at O T Williams," but Luke complains that "the opportunity was not reasonable because Luke was not given the opportunity to speak." (*Id*., at 8–9).  This assertion is not fully supported by the evidence in the record (Dkt. Nos. 20, ¶ 45; 20-23).  The Court has reviewed the audio recording of the City Council meeting.  At that meeting, Luke's counsel was permitted to speak but was also informed by Mayor Harris and the City Attorney that the proper procedure for Luke to follow was to ask for a variance from the Planning Commission and then, if the determination of the Planning Commission was unfavorable, appeal to the City Council (Dkt. No. 20-23).  Further, Luke's counsel was informed at that time that the structures on the O T Williams properties are sheds, are not meant for human habitation, and do not meet the current zoning or building codes and, thus, cannot be connected to the City's electricity; Luke's counsel was told that the City Council meeting was not the proper venue to address Luke's zoning issue in the first instance (Dkt. No. 20, ¶ 46).

In its brief in response to Defendants' motion for summary judgment, Luke contends, without support in the record, that a "final decision . . . [had] not been made concerning whether the cabins on O.T. Williams could be developed by Luke, and if not, why not." (*Id*., at 9).  However, based on the undisputed record before the Court, Luke had been advised many times by City officials and City attorneys that a decision had been made that Luke's property could not be developed as envisioned by Ms. Robinson (Dkt. Nos. 20-13; 20-17; 20-20).  Luke's counsel even acknowledged during the City Council meeting that the City Attorney had already provided a letter answering why the structures could not be placed on the property, stated that he and Ms. Robinson did not agree with that answer, and explained that he and Ms. Robinson were at the Council essentially to appeal that decision (Dkt. Nos. 20, at ¶ 47; 20-17; 20-20).  The Court determines

23

that, in the light of the undisputed facts before the Court, the City provided Luke notice and an opportunity to be heard. Accordingly, even if this Court were to consider Luke's due process claim, the Court would conclude that Luke is entitled to no relief on the claim.

For these reasons, the Court grants Defendants' summary judgment on Luke's procedural due process claim.

### D.      Qualified Immunity

"Qualified immunity shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A two-step inquiry determines whether qualified immunity should be granted: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id*.

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citation omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). *See also Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("[Qualified immunity] provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

24

Because the Court has determined that, even if this Court were to consider Luke's due process claim, the Court would conclude that Luke cannot make out a violation of a constitutional right by Defendants, Mayor Harris is entitled to qualified immunity.

### IV.    Conclusion

The Court grants Defendants' motion for summary judgment (Dkt. No. 18) and dismisses with prejudice Luke's complaint (Dkt. No. 2).

It is so ordered this 25th day of March, 2026.

Kristine G. Baker
Chief United States District Court Judge